IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DANA DAVID JOHNSON,
        Petitioner,

vs.                                        Case No.:  5:16cv352/LAC/EMT

FLORIDA DEPARTMENT OF CORRECTIONS,
        Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 19).  Petitioner filed a reply (ECF No. 21).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 19).[1]  Petitioner was charged in the Circuit Court in and for Washington County, Florida, Case No. 2012-CF-207, with one count of manufacturing crack cocaine (Count I) and one count of selling cocaine (Count II) (Ex. B1 at 6).  Following a jury trial on March 27, 2013, Petitioner was found guilty as charged (Ex. B1 at 32, Ex. B4, Ex. B5).  On May 13, 2013, the court sentenced Petitioner to twelve (12) years in prison on Count I, and a concurrent term of twelve (12) years in prison on Count II, with jail credit of 321 days (Ex. B1 at 66–71, Ex. B2).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-2441 (Ex. B7).  The First DCA affirmed the judgment on November 14, 2014, with the mandate issuing December 2, 2014 (Exs. B9, B10).  Johnson v. State, 150 So. 3d 214 (Fla. 1st DCA 2014).

On April 6, 2015, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. C at 1–9).  The state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 19).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

filing an amended motion (*see* Ex. C1 at 25).  Petitioner filed an amended motion on August 27, 2015 (*id.* at 7–24).  The circuit court summarily denied three of Petitioner's four claims (Grounds One, Three, and Four), and directed the State to respond to Ground Two (*id.* at 25–28).  The State filed a response to Ground Two (*id.* at 30–33).  On January 27, 2016, the circuit court issued a final order denying Petitioner's amended Rule 3.850 motion (*id.* at 37–39).  Petitioner appealed the decision to the First DCA, Case No. 1D16-0840 (Ex. C2).  The First DCA affirmed the decision per curiam without written opinion on July 6, 2016, with the mandate issuing August 13, 2016 (Exs. C4, C7).  Johnson v. State, 197 So. 3d 46 (Fla. 1st DCA 2016) (Table).

Petitioner filed the instant federal habeas action on December 21, 2016 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254.  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *See* <u>Thaler v. Haynes</u>, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly

established federal law.  *See* Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  Williams, 529 U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their

> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."   Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in state court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination

of the facts" standard is implicated only to the extent the validity of the state court's

ultimate conclusion is premised on an unreasonable fact finding.  *See* Gill v.

Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).   As with the "unreasonable

application" clause, the federal court applies an objective test.  Miller-El v. Cockrell,

537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state

court decision based on a factual determination "will not be overturned on factual

grounds unless objectively unreasonable in light of the evidence presented in the state

court proceeding.").  Federal courts "may not characterize . . . state-court factual

determinations as unreasonable merely because we would have reached a different

conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti, 551 U.S. at 954. Even then, the writ will not

issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  Richter, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One:  "Double Jeopardy Violation."

Petitioner alleges his convictions for manufacturing cocaine and selling cocaine violated double jeopardy (ECF No. 1 at 5).[2]  He alleges the State had no authority to try and convict him because "there was no drug sale involved" (id.).  Petitioner alleges the charges arose from a controlled buy involving a confidential informant ("CI") (id.).  Petitioner alleges the CI testified that Petitioner did not sell him drugs; instead, Petitioner simply located a supplier and purchased drugs on the CI's behalf, and accepted money and drugs from the CI in return (id.).  Petitioner alleges he presented Ground One to the state court on direct appeal of his conviction (id. at 6).

Respondent argues that although Petitioner presented a double jeopardy argument on direct appeal of his conviction, he did not fairly present a federal basis for his claim and instead relief exclusively on state statutes and state appellate

---

[2] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than those of the original documents.

decisions (ECF No. 19 at 6–7). Respondent contends Petitioner thus failed to exhaust a federal double jeopardy claim, to the extent Petitioner asserts a federal claim in Ground One (*id.*). Respondent contends any further attempt to exhaust a federal claim in state court would be procedurally barred, and thus procedurally defaulted for federal habeas purposes (*id.* at 7–9). Respondent contends Petitioner has not established he is entitled to federal review of his double jeopardy claim under either the "cause and prejudice" or "actual innocence" exception to the procedural default (*id.* at 9).

Respondent additionally contends that, notwithstanding the failure to exhaust, Petitioner is not entitled to relief, because the state court adjudicated the claim on the merits, and the First DCA's rejection of the double jeopardy claim was not contrary to or an unreasonable application of clearly established federal law (ECF No. 19 at 19–22).

In Petitioner's reply, he states he exhausted his state court remedies (*see* ECF No. 21 at 5).

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

    The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as

---

[3] Section 2254 provides, in pertinent part:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
            (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

In announcing that "the substance of a federal habeas corpus claim must first be

presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention

that the petitioner satisfied the exhaustion requirement by presenting the state courts

only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general

appeal to a constitutional guarantee as broad as due process to present the "substance"

of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276,

74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a

jury instruction violated due process because it obviated the requirement that the

prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459

U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was

by referring to a state court decision in which "the defendant . . . asserted a broad

federal due process right to jury instructions that properly explain state law."

Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a

state-court decision predicated solely on state law was sufficient to fairly apprise a

reviewing court of a potential federal claim merely because the defendant in the cited

case advanced a federal claim. *Id.*, 459 U.S. at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar

---

[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

document) that does not alert it to the presence of a federal claim in order to find

material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124

S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The <u>Baldwin</u> Court commented that "a litigant

wishing to raise a federal issue can easily indicate the federal law basis for his claim

in a state-court petition or brief, for example, by citing in conjunction with the claim

the federal source of law on which he relies or a case deciding such a claim on federal

grounds, or by simply labeling the claim 'federal.'"  *Id.*, 541 U.S. at 32.  With regard

to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291

(11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion.  However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal
> judiciary.'" <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d [1277,] 1184 [(M.D.
> Ala. 2004)] (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct.
> 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law
> established by the Supreme Court. . . . We therefore hold that "'[t]he
> exhaustion doctrine requires a habeas applicant to do more than scatter
> some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

_____

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal
case in a string citation containing other state cases, and in a closing paragraph in his argument that
extraneous materials were considered by the jury during deliberations, stated that there was a

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).

Here, the state court record shows that in Petitioner's initial brief on direct appeal, he argued that because his convictions for manufacture of crack cocaine and sale of cocaine arose from the same criminal episode, and both offenses constituted violations of the same statutory subsection requiring identical elements of proof, his convictions for both offenses "violate the constitutional and statutory prohibitions against double jeopardy" (see Ex. B7).  In making this argument, Petitioner relied on Cook v. State, 813 So. 2d 1010, 1011 (Fla. 1st DCA 2002), which decided a double jeopardy claim on both federal and state law grounds (see Ex. B7 at 10–11). Additionally, Petitioner extensively discussed State v. McCloud, 577 So. 2d 939, 940–41 (Fla. 1991), in which the Florida Supreme Court applied Florida Statute § 775.021(4)(b) and expressly noted that the statute codified the test established in

---

violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932),

which is the seminal federal case on the Fifth Amendment's Double Jeopardy Clause.

Further, the record indicates that both the State and the First DCA were aware

that Petitioner was presenting a federal double jeopardy claim. In its answer brief, the

State argued that Petitioner's convictions did not violate the Double Jeopardy Clause

of the Fifth Amendment or Supreme Court cases interpreting and applying that Clause

(*see* Exs. B8 at 7–13 (citing Blockburger, *supra*; North Carolina v. Pearce, 395 U.S.

711 (1969); and United States v. Dixon, 509 U.S. 688 (1993)). In the First DCA's

written opinion adjudicating Petitioner's double jeopardy claim, the court cited Partch

v. State, 43 So. 3d 758, 759–60 (Fla. 1st DCA 2010) as setting out the three-step

inquiry into whether a defendant's convictions violate the Constitution, and the First

DCA applied that three-step inquiry in adjudicating Petitioner's double jeopardy claim

(*see* B9).

In light of this record, the undersigned concludes that Petitioner fairly presented

a double jeopardy claim to the First DCA on direct appeal. *See* Wilkerson v.

Superintendent Fayette SCI, 871 F.3d 221, 229 (3d Cir. 2017) ("In view of the close

relationship between Pennsylvania's merger doctrine and federal double jeopardy

jurisprudence, and Wilkerson's citation to [Commonwealth v.] Anderson, [538 Pa.

574, 650 A.2d 20 (1994)], which itself relies on Supreme Court jurisprudence, we conclude that Wilkerson has 'assert[ed] [his] claim[s] in terms so particular as to call to mind a specific right protected by the Constitution,' and thus did fairly present his claim to the Pennsylvania Superior Court.").

    1.  Clearly Established Federal Law

  "The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be 'subject for the same offence to be twice put in jeopardy of life or limb.'" Jones v. Thomas, 491 U.S. 376, 380, 109 S. Ct. 2522, 105 L. Ed. 2d 322 (1989) (quoting U.S. Const., amend. V)). In addition to protecting against multiple prosecutions for the same offense, the Clause also prohibits "multiple punishments for the same offense imposed in a single proceeding." *Id.* 491 U.S. at 381 (internal quotation marks omitted). In the context of multiple punishments, the court "must examine the various offenses for which a person is being punished to determine whether, as defined by the legislature, any two or more of them are the same offense." United States v. Dixon, 509 U.S. 688, 745, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993). In effect, the reviewing court must ask whether the offenses are "sufficiently distinguishable to permit the imposition of cumulative punishment." *Id.*, 509 U.S. at 745 (quotation marks omitted). The double jeopardy bar applies if the two offenses

for which the defendant is tried or punished cannot survive the "same-elements" or

"Blockburger" test. *Id.* at 696 (citing Blockburger, 284 U.S. at 304). This test

"inquires whether each offense contains an element not contained in the other; if not,

they are the 'same offence' and double jeopardy bars additional punishment and

successive prosecution." Dixon, 509 U.S. at 696. Although this federal habeas court

will decide whether a double jeopardy violation has occurred under federal law, it

must accept the state court's interpretation of that State's own statutes. *See* Tarpley

v. Dugger, 841 F.2d 359, 364 (11th Cir. 1988) (citing Missouri v. Hunter, 459 U.S.

359, 368, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983)).

    2.    Federal Review of State Court Decision

As previously discussed, Petitioner presented his federal double jeopardy claim

on direct appeal (Ex. B7). The First DCA adjudicated the claim as follows:

> In order to determine if a defendant's convictions violate double
> jeopardy, it must first be ascertained if the offenses were based on an act
> or acts that occurred within the same criminal transaction and/or episode.
> Partch v. State, 43 So. 3d 758, 760 (Fla. 1st DCA 2010). If the offenses
> occurred during the same transaction or episode, it must then be
> determined if the convictions were predicated on distinct acts. *Id.* If the
> offenses are not predicated on distinct acts and occurred within the same
> criminal episode, it must be decided if the offenses survive a "same
> elements" test as defined by section 775.021, Florida Statutes, which is
> commonly referred to as the *Blockburger*[FN 1: *Blockburger v. United
> States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)] analysis. *Id.*
> Section 775.021, Florida Statutes (2011), provides in part:

(4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively. For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.

(b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection (1) to determine legislative intent. Exceptions to this rule of construction are:

1. Offenses which require identical elements of proof.

2. Offenses which are degrees of the same offense as provided by statute.

3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Section 893.13(1)(a), Florida Statutes (2011), provides that "[i]t is unlawful for any person to sell, manufacture, or deliver, or possess with intent to sell, manufacture, or deliver, a controlled substance." The term "sell" means "to transfer or deliver something to another person in exchange for money or something of value or a promise of money or something of value." Fla. Std. Jury Instr. (Crim.) 25.2. The term "manufacture" means the "production, preparation, propagation, compounding, cultivating, growing, conversion, or processing of a controlled substance, either directly or indirectly, by extraction from

substances of natural origin, or independently by means of chemical synthesis . . . ." § 893.02(15)(a), Fla. Stat. (2011).

According to Appellant, the Legislature defined a "single statutory offense" in section 893.13(1)(a). We disagree. The plain language of the statute prohibits four different acts—the sale, manufacture, delivery, or possession with intent to sell, manufacture, or deliver a controlled substance. Although Appellant cites *State v. McCloud*, 577 So. 2d 939 (Fla. 1991), on appeal, the case supports affirmance in this case. In *McCloud*, the supreme court addressed the certified question of whether convictions "based on the crimes of sale and possession (or possession with intent to sell) of the same quantum of contraband" violate the prohibition against double jeopardy. *Id.* at 940. In answering the question in the negative, the supreme court concluded that "because there are situations . . . where a sale can occur without possession, possession is not an essential element of sale and is therefore not a lesser-included offense." *Id.* at 941.

While Appellant attempts to distinguish *McCloud* on the basis that the defendant in that case was convicted of crimes under "two distinct subsections" of section 893.13 while he [Appellant] was convicted of two crimes under a single subsection, the certified question included the offense of possession with intent to sell, an offense prohibited by the same subsection of section 893.13 as the sale of a controlled substance. In *Thomas v. State*, 61 So. 3d 1157, 1158 (Fla. 1st DCA 2011), we rejected the appellant's argument that his convictions for selling cocaine within 1000 feet of a school and possession of cocaine with intent to sell within 1000 feet of a school, both violations of section 893.13(1)(c), violated the prohibition against double jeopardy. In doing so, we relied upon *McCloud*, reasoning that "[a]s the [certified] question is worded and answered in *McCloud*, the instant convictions would not constitute double jeopardy." *Id.* at 1158–59; *see also State v. Oliver*, 581 So. 2d 1304, 1305 (Fla. 1991) (relying on *McCloud* in holding that convictions for possession with intent to sell cocaine and sale of cocaine did not violate the prohibition against double jeopardy); *McMullen v. State*, 876 So. 2d 589, 590 (Fla. 5th DCA 2004) (citing *McCloud* in support of its

holding that the offenses of sale of cocaine within 1000 feet of a place
of worship and possession of cocaine with the intent to sell or deliver
within 1000 feet of a place of worship, both violations of section
893.13(1)(e)1, did not violate the prohibition against double jeopardy);
*Huey v. State*, 722 So. 2d 286, 286 (Fla. 5th DCA 1998) ("There is no
double jeopardy violation when a defendant is convicted of the crime of
delivery of a controlled substance and possession with intent to sell the
same substance, because each crime contains an element that the other
does not.").

Based upon the foregoing authorities and the fact that the offenses
at issue in this case each contain an element that the other does not, we
reject Appellant's argument that his convictions violate the prohibition
against double jeopardy.  We, therefore, AFFIRM.

Johnson, 150 So. 3d at 214–16.

This federal court must abide by the state court's interpretation of state law. *See*

Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005);

Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

Here, the state court determined that Florida Statutes § 893.13(1)(a) prohibits four

different acts—the sale, manufacture, delivery, or possession with intent to sell,

manufacture, or deliver a controlled substance.  The state court also determined that

the offenses of manufacture of cocaine and sale of cocaine each contained an element

that the other did not.  Deferring to these interpretations of § 893.13(1)(a), Petitioner

failed to demonstrate that the First DCA's rejection of his double jeopardy claim was

contrary to, or an unreasonable application of, clearly established federal law. Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

      B.    <u>Ground Two:  "Ineffective Assistance of Counsel."</u>

Petitioner alleges defense counsel was aware that the CI gave Petitioner money to buy drugs for him, and that the CI paid Petitioner for his services with the same drugs (ECF No. 1 at 7).  Petitioner alleges the CI testified at trial that he knew that Petitioner was a drug addict, and he further testified that he "went out of his way to set up" Petitioner (*id.*).  Petitioner alleges the CI also testified that the police told him that if he set up Petitioner, they would "put in a good word" with the State Attorney (*id.*).  Petitioner contends defense counsel was ineffective for failing to file a pre-trial motion to dismiss the charges based upon "objective entrapment" and to effectively argue the defense at trial (*id.*).

Respondent asserts that Petitioner's ineffective assistance of counsel ("IAC") claim "appears" to be exhausted, but if this court disagrees, Respondent "reserves its right to object to Petitioner's failure to do so" (ECF No. 19 at 9–10).  Respondent contends Petitioner has failed to demonstrate that the state court's adjudication of the IAC claim was based upon an unreasonable factual finding, or contrary to or an unreasonable application of clearly established federal law (*id.* at 22–26).

1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. Strickland, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."

Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla.

Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112).

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 131 S. Ct. at 788.

As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

    2.    Federal Review of State Court Decision

Petitioner presented this IAC claim as Ground One of his amended Rule 3.850

motion (Ex. C1 at 10–13).  The state circuit court adjudicated the claim as follows:

> In **Ground 1**, . . . the Defendant alleges that counsel was ineffective for failing to file a pretrial motion to dismiss the charges based upon an objective entrapment defense and failing to effectively argue objective entrapment during his motion for judgment of acquittal.
>
> However, the Defendant's allegations fail to establish either prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Further, Defendant's allegations are [too] conclusory in nature to warrant relief. *See Kennedy v. State*, 547 So. 2d 912 (Fla. 1989) ("A defendant may not simply file a motion for post conviction relief containing conclusory allegations that his or her trial was ineffective and then expect to receive an evidentiary hearing.").  Further, counsel is not ineffective for failing to file motions that have no merit.  *See Magill v. State*, 457 So. 2d 1367 (Fla. 1984).  While counsel may be ineffective for failing to investigate

a valid defense, the defense in question must be viable.  *See
Panagiotakis v. State*, 619 So. 2d 345 (Fla. 2nd DCA 1993).
Accordingly, counsel is not ineffective for failing to raise a meritless
claim.  *See Farina v. State*, 937 So. 2d 612, 619 n.5 (Fla. 2006) (quoting
*Teffeteller v. Dugger*, 734 So. 2d 1009, 1023 (Fla. 1999) for the
proposition that "Trial counsel cannot be deemed ineffective for failing
to raise meritless claims or claims that had no reasonable probability of
affecting the outcome of the proceeding.")).  Regardless, the Defendant's
claim and allegations are without merit.  Thus, the Defendant's ground
is due to be denied.

(Ex. C1 at 26).  The First DCA affirmed the decision without written opinion (Ex.

C4).

In State v. Myers, 814 So. 2d 1200 (Fla. 1st DCA 2002), the First DCA

summarized the law governing the "due process" or "outrageous conduct" defense,

which is the defense Petitioner contends defense counsel should have argued in

support of dismissal of the charges in his case:

Florida first recognized the due process defense in *State v.
Glosson*, 462 So. 2d 1082 (Fla. 1985).  In *Glosson*, the Eighth Circuit
State Attorney's Office knew about and supervised the operations of an
undercover informant named Wilson.  *See id.* at 1083.  The Levy County
Sheriff made an agreement with Wilson "whereby Wilson would receive
ten percent of all civil forfeitures arising out of successful criminal
investigations [Wilson] completed in Levy County."  *Id.*  Relying upon
federal case law, the supreme court observed, "The due process defense
based upon governmental misconduct is an objective question of law for
the trial court, as opposed to the subjective predisposition question
submitted to the jury in the usual entrapment defense."  *Id.* at 1084.  The
court went on to note that the United States Supreme Court "appeared to
recognize the due process defense, regardless of the defendant's

predisposition, where 'the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *Id.* at 1084 (quoting *United States v. Russell*, 411 U.S. 423, 431–32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) (dicta)).  Observing "governmental misconduct which violates the constitutional due process right of a defendant . . . requires the dismissal of criminal charges," the supreme court concluded that the fee agreement in *Glosson* violated a defendant's right to due process.  *Id.* at 1085.

The due process defense recognized in *Glosson* will also apply where officers manufacture illicit drugs that are later used by law enforcement to carry out reverse sting operations.  *See State v. Williams*, 623 So. 2d 462 (Fla. 1993).  In *Williams*, the court focused upon the actions of the Broward County Sheriff's Office in actually manufacturing crack cocaine for the sting operations, noting that such manufacture was prohibited by section 893.02(12)(a), Florida Statutes (1989), and characterized the illegal manufacture of illicit drugs by law enforcement as "worlds apart" from the mere delivery of a controlled substance in a standard reverse sting operation.  *Id.* at 466.  Concluding that the due process defense would apply to such a law enforcement operation, the court noted:

> [T]he protection of due process rights requires that the courts refuse to invoke the judicial process to obtain a conviction where the facts of the case show that the methods used by law enforcement officials cannot be countenanced with a sense of justice and fairness. The illegal manufacture of crack cocaine by law enforcement officials violates this Court's sense of justice and fairness.

*Id.* at 467.  *See also Metcalf v. State*, 635 So. 2d 11 (Fla. 1994) (reversing conviction of solicitation to deliver cocaine because police used illegally manufactured drugs in a reverse sting operation).

Myers, 814 So. 2d at 1201–02.  Applying this standard to the facts of Myers, the First DCA held that the government's use of a probationer as a confidential informant in the sting operation that led to charges against defendant Myers, without following the local custom of securing permission from the probationer's sentencing judge before using him as an informant, did not violate Myers' due process rights.  *Id.* at 1202–03.

Here, Petitioner faults defense counsel for failing to file a pre-trial motion to dismiss based upon an objective entrapment/due process defense.  Rule 3.190 of the Florida Rules of Criminal Procedure provides that a defendant may file a pre-trial motion to dismiss the charges on the ground that there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant.  Fla. R. Crim. P. 3.190(c)(4).  The motion to dismiss must include specific, sworn factual allegations.  *Id.*  The trial court must deny a defendant's motion to dismiss if the State files a traverse that, with specificity, denies under oath the material facts alleged in the defendant's motion.  *See* Fla. R. Crim. P. 3190(d).

Petitioner alleges the following facts support an objective entrapment defense: (1) the CI knew that Petitioner was a drug addict; (2) the CI gave Petitioner money to buy drugs for him, and (3) the CI paid Petitioner for his services with some of the same drugs.

The trial transcript, which is part of the state court record, shows that the CI, David McKinney, testified that in 2012, he had three criminal counts of dealing in stolen property pending against him (Ex. B4 at 17–36, 144–45).  McKinney testified that Investigator Pelfrey agreed that he (Pelfrey) would "put in a good word" for McKinney with the local prosecutor if McKinney located people from whom he could buy drugs and participated in five to seven controlled buys (*id.*).  McKinney testified he (McKinney) chose Petitioner as a source for a potential controlled buy, because he knew that Petitioner had bought drugs in the past and had a drug abuse problem (*id.* at 29).  McKinney testified he and Petitioner talked on the telephone a couple of times, and McKinney asked Petitioner if Petitioner could get him $60 worth of crack cocaine (*id.*).  McKinney testified that Petitioner stated that he could get some "dope" for McKinney (*id.*).  McKinney testified he reported this information to Investigator Pelfrey and Lieutenant Thompson (*id.*).  McKinney testified the officers gave him $60 and equipped him with an audio and video recording device (*id.*).  McKinney testified he met Petitioner at Petitioner's mother's house and gave Petitioner the $60 (*id.*).  McKinney testified Petitioner left the house (*id.*).  McKinney testified that approximately 30 minutes passed, so McKinney called Petitioner (*id.*).  McKinney testified Petitioner told him he was across the street, so McKinney picked up

Petitioner and they returned to the house (*id.*). McKinney testified Petitioner had a bag of cocaine powder with him (*id.*). McKinney testified that when they arrived back at the house, McKinney watched as Petitioner cooked some of the powder cocaine into crack cocaine (*id.*). McKinney testified that Petitioner then gave him the powder cocaine in a clear baggie, and the crack cocaine in a torn piece of plastic from a grocery bag (*id.* at 143–45, 147). McKinney testified he left the house and drove to the agreed-upon meeting place, where he met Investigator Pelfrey and Lieutenant Thompson (*id.*).

Lieutenant Thompson also testified at Petitioner's trial. During cross-examination, defense counsel, Attorney Peacock, asked Thompson whether it was common practice for a CI to give some of the drugs obtained during the controlled buy back to the person who acquired the drugs (Ex. B4 at 89). Thompson testified, "No, sir, there are occasions when normally a source will provide drugs to our source and keep a portion." (*id.*). Attorney Peacock asked Thompson whether it was part of his or Investigator Pelfrey's personal practice to instruct a CI to give part of the drugs acquired during a controlled buy back to the source of the drugs (*id.* at 90). Thompson responded no (*id.*).

Attorney Peacock called Mr. McKinney as a defense witness, and inquired about the details of Petitioner's providing the drugs to McKinney:

Q. And how did you get custody of that [the "dope"]?

A. The defendant had give it [sic] to me.

Q. When you say that he gave it to you, he didn't physical [sic] hand it to you, did he?

A. He was sitting on the table and he said, "Here you go".

. . . .

Q. Did you say he could snort some have [sic] it as partial payment?

A. I asked him if he wanted some.

Q. You asked him if he wanted some?

A. I said, "You getting any of that for yourself," I just wanted out of the house.

Q. Did he get some of it?

A. No, sir.

Q. You're saying he didn't?

A. He didn't get none [sic] of it. He had the spoon left with the residue in it, that was it.

. . . .

Q. . . . Now, isn't it true that you were right there in that house, in the kitchen area, whenever you offered Mr. Johnson [Petitioner] to take portions of whatever that substance was for his benefit of helping you to obtain cocaine?

A  Yes, sir.

Q.  Thank you.  Now, that being said, you offered him that in exchange for his assistance in obtaining whatever that substance was, for you, right?

A.  Yes, sir.

Q.  And you know that at that moment, you were acting as an agent of law enforcement by doing that, correct, a confidential informant makes you an agent of law enforcement?

A.  I didn't know.

. . . .

Q.  You were listed as a confidential informant, right?

A.  Yes, sir.

Q.  So you were helping the cops to make drug arrest [sic]?

A.  Yes, sir.

(Ex. B4 at 135, 141–42).

At the conclusion of Attorney Peacock's presentation of Mr. McKinney's

testimony, counsel moved to dismiss the charges:

MR. PEACOCK [defense counsel]:  I'd like to renew my motion for dismissal, the burden now shifts, and I have proved to this Court that this confidential informant admitted and said that he gave part of this alleged drug substance to my client in order to conduct the transaction that he did.

That's illegal, judge, that's just flat illegal, he was acting as an agent of the state as a confidential informant.  He gave part of the

proceeds of this substance, whatever it was at that time to my client, knowing full well that my client has a history of drugs and a history of drug abuse and knowing that he, himself, has a history of drug problems, talking about the confidential informant, and he's acting as an agent of the state giving my client, a former drug user, access and use to the drugs that he promoted my client to go and acquire for him.

I think that is a flat illegal behavior on the part of any agent of the state, whether he's a convicted felon or a pristine clean school boy that is fresh out of school with no history at all.  For him to do that as a confidential informant and give the, quote, suspect drugs as part of the transaction to seal the charges, I think that's illegal.  I think it's patently, flatly illegal, and I'm asking you to dismiss this case on those grounds.

(Ex. B4 at 151–52).

In response, the State disputed defense counsel's factual assertion that CI

McKinney gave Petitioner a portion of the drugs (Ex. B4 at 152).  The State argued:

Your Honor, my recollection of the testimony is that he did offer him a part of it or asked him if he was going to keep part of it for himself, but the defendant didn't keep anything, other than the spoon, which was from the defendant's residence, with the residue on it.

(Ex. B4 at 152).

The trial court ruled:

I would agree that if those were the facts that Mr. Peacock recited, that it would be illegal.  I took copious notes during Mr. McKinney's testimony, just recently here when called on direct by the defendant, and the notes that I have and the testimony that I recall was that Mr. McKinney asked the defendant if he wanted some, but the defendant got none of it.

> I don't recall the facts, Mr. Peacock, as you have testified that he received anything else.  I am going to deny your motion for judgment of acquittal, based upon the testimony that the Court believes that it has heard, not withstanding [sic] your argument.

(Ex. B4 at 153).  Attorney Peacock requested review of the court reporter's transcription of Mr. McKinney's testimony, and the court granted counsel's request (*id.* at 153–55).  After reviewing the transcription, Attorney Peacock renewed his motion, and the court reviewed the relevant portion of Mr. McKinney's testimony (*id.* at 155–56).  At the conclusion of the court's review, the court ruled:

> THE COURT:  Again, then, taking the opportunity to review the testimony and the notes that I had had [sic] do seem to purport to my recollection.
>
> While I suspect argument could be made to a jury that the defendant never relinquished his possession of the spoon, there is no testimony, that I find, where the confidential informant gave to the defendant anything to snort or ingest, rather the offer was made and he got none.
>
> So, I will deny the motion for judgment of acquittal, understanding, Mr. Peacock, your argument, and having an opportunity to review the testimony, again, the ruling remains the same.

(Ex. B4 at 156–57).

The state post-conviction court reasonably concluded that Petitioner failed to satisfy either prong of the <u>Strickland</u> standard.  The state court record is clear that Attorney Peacock sought to dismiss the charges on the ground that a government

agent engaged in misconduct during the controlled buy. The State disputed the factual basis for the motion. Upon reviewing the evidence, the trial court denied defense counsel's motion on the ground that there was no evidence of governmental misconduct. There is no reasonable probability the trial court's ruling would have been any different if defense counsel had made the motion to dismiss prior to trial, as opposed to making it during trial.

Petitioner failed to demonstrate that the state court's adjudication of his IAC claim was contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to federal habeas relief on Ground Two.

C.    Ground Three:  "Ineffective Assistance of Counsel."

Petitioner contends Attorney Peacock was ineffective for advising him not to testify, because the jury would learn that he had a criminal history (ECF No. 1 at 8). Petitioner alleges he had no history of dealing drugs, and wanted to tell the jury "his side of the story" (*id.*). Petitioner alleges if he testified, he would have stated the following:  (1) the CI gave him money to buy drugs for the CI; (2) the CI paid Petitioner in drugs; and (3) Petitioner did not sell the CI any drugs (ECF No. 21 at 19–21). Petitioner alleges his testimony would have been corroborated by the CI's

testimony, and would have established an entrapment defense (ECF No. 1 at 8; ECF No. 21 at 19–22).

Respondent asserts that Petitioner's IAC claim "appears" to be exhausted, but if this court disagrees, Respondent "reserves its right to object to Petitioner's failure to do so" (ECF No. 19 at 10–11).  Respondent contends Petitioner has failed to demonstrate that the state court's adjudication of the IAC claim was based upon an unreasonable factual finding, or contrary to or an unreasonable application of clearly established federal law (*id.* at 26–35).

> 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground Two of his amended Rule 3.850 motion (Ex. C1 at 13–19).  The state circuit court adjudicated the claim as follows:

> In **Ground 2**, Defendant alleges that counsel was ineffective in failing to advise the Defendant to testify on his own behalf at trial.  The Defendant indicates that the Defendant consulted with defense counsel about whether or not to testify.  The Defendant claims that he told counsel that he wanted to testify to convey to the jury about how he had been entrapped.  However, Defendant states that he acquiesced to counsel's advice not to testify due to his prior convictions.  Defendant alleges that his testimony "would have been the only way to unequivocally convey evidence as to the objective entrapment of law enforcement—that the Defendant, a known drug addict, was paid with

crack residue in exchange for his services in a drug transaction arranged by a confidential informant working under law enforcement." Defendant further indicates the following:

> "Had the Defendant testified, he would have stated that McKinney gave him $60 to obtain a gram of powder cocaine. The Defendant obtained the powder cocaine, and cooked some of it into crack cocaine in McKinney's presence. McKinney asked the Defendant if he wanted any powder cocaine and the Defendant responded that he wanted what was left on the spoon—the crack cocaine residue. The residue on the spoon was a sufficient portion to get high. McKinney thus left the Defendant the crack cocaine residue on the spoon in exchange for the Defendant procuring the powder cocaine.
>
> The Defendant's testimony combined with McKinney's testimony (T.135, 141) would have established a prima facie case of objective entrapment. The crack cocaine residue on the spoon was enough for the Defendant to get high. Further, the crack cocaine residue on its own would have been enough to sustain a conviction for possession of cocaine; therefore, it is a sufficient amount to show that the Defendant received drugs from the CI in exchange for his facilitating a drug transaction."

*See* Defendant's Amended Rule 3.850 Motion at page 12.

It is clear from the record that counsel continuously renewed discussions with the Defendant as to the Defendant's right to testify throughout the trial depending on what happened at each point in terms of the evidence or testimony presented. Counsel indicated on the record that he had already had conversations with his client about whether or not he would testify but they "had decided that we would wait and subject that question for review again, after we hear the state's actual testimony . . . . I would ask for a brief recess after that, somewhere along

the line when the state rest [sic] their case, so that I can tell my client about that and we can go over that evaluation again" [ TT 101–102]. Later the Court inquired [TT Beg. 126] as to Defendant's decision to testify with counsel asking the Court to possibly inquire "again possibly after the testimony of Mr. McKinney on the defense's side of the case . . ." The Court made it very clear that ultimately it was the Defendant's decision whether to testify, not counsel's, and then indicated "I would give, then, Mr. Peacock, your client some additional time to chat with you, given how things may unfold . . ." Defendant indicated at that time that he had not yet decided whether he would testify. Later the Court inquired again [TT. Beg. 158] as to Defendant's right to testify explaining that counsel could give him advice but ultimately it was Defendant's decision. Counsel indicated that they had discussed multiple times whether or not Defendant should testify. Defendant agreed and decided not to testify.

The record reflects that Defendant made a knowing and voluntary decision not to testify. The Court made it clear that counsel could give advice but that Defendant did not have to take counsel's advice and that whether to testify was Defendant's decision alone. Defendant alleges that he told counsel he wanted to testify and tell the jury about how he was entrapped but counsel advised against it and Defendant took that advice with the Court fully informing him on the record that he did not have to take counsel's advice and that it was his decision. Now it appears Defendant regrets his decision to take counsel's advice, but that is not a basis for post conviction relief.

The Court would also note that if Defendant had testified as set forth above it would have been an admission from the Defendant's mouth that he was guilty of both offenses with which he was charged. Additionally, according to the sentencing transcript and scoresheet, Defendant did have multiple prior convictions that the jury would have learned of had Defendant testified, which any defense counsel knows is very damaging to a Defendant's case and makes any Defendant's testimony far less credible. Thus, Defendant's ground is due to be denied.

(Ex. C1 at 37–39).  The First DCA affirmed the decision without written opinion (Ex. C4).

A criminal defendant has a fundamental right to testify on his own behalf at trial.  Rock v. Arkansas, 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc).  That right "cannot be waived either by the trial court or by defense counsel," and a "criminal defendant cannot be compelled to remain silent by defense counsel."  Teague, 953 F.2d at 1532.  "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide."  Teague, 953 F.2d at 1533.

Here, Petitioner alleges Attorney Peacock advised him that one of the strategic implications of his testifying on his own behalf was that the jury would learn that he had a prior criminal record.  This advice was reasonable.  Petitioner's Criminal Punishment Code Scoresheet was part of the state court record (Ex. B4 at 72–74).  According to the Scoresheet, Petitioner had prior felony convictions as well as a conviction for a crime of dishonesty (*see id.*).  Under Florida law, the State could have

used Petitioner's prior felony convictions to attack his credibility.  *See* Fla. Stat. §

90.610(1).

Additionally, the trial transcript demonstrates that Petitioner was advised of his

right to testify or not testify, and that the decision whether to testify was his, alone, to

make:

> THE COURT:  You are charged in this case.  You understand, sir, that the U.S. and Florida Constitution gives you an absolute right to remain silent, you understand that, sir?
> . . . .
> DANA DAVID JOHNSON: Yes, sir.
>
> THE COURT:  You also have the right, sir, to testify at this trial, this is that point in time where you need to make that decision, have you come to a decision, at least at this point, as to whether or not you wish to testify?
>
> DANA DAVID JOHNSON:  No, sir, I'm not sure.
>
> THE COURT:  Okay, you're not sure yet?
>
> DANA DAVID JOHNSON:  No, sir.
>
> THE COURT:  Okay, all right.  You understand, sir, that Mr. Peacock can give you advice as to options that you might have, advice as to strategy and his advise [sic] based upon his view of the evidence, but the ultimate decision, sir, to choose to testify or not rest [sic] with you and you alone.  Do you understand that?
>
> DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  All right, sir. I would give, then, Mr. Peacock, your client some additional time to chat with you, given how things may unfold.

I do need to ask, Mr. Johnson, at this stage, are you satisfied with the services and representation that Mr. Peacock has provided?

DANA DAVID JOHNSON:  Yes, sir.

(Ex. B4 at 127–28).

After Attorney Peacock presented Mr. McKinney's testimony in support of the objective entrapment/due process defense, and before the defense rested its case, the trial court again questioned Petitioner about his decision whether or not to testify:

THE COURT:  Mr. Johnson, you understand, as I had asked you sometime [sic] ago, an hour or so ago, that you do have the absolute right to choose to testify at this trial?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  And while Mr. Peacock can give you his advice of many, many years, and he can give you his opinions, and he can discuss with you strategies, he can not [sic] force you to testify, and he can not [sic] force you to not testify, do you understand that?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  Are you, then—what is your decision, then, here this afternoon as today is, and right now is, the time of your decision?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT: What is you [sic] want to do, sir?

DANA DAVID JOHNSON:  Not testify.

THE COURT:  You understand, sir, that at a later date, you will not be heard to complain that someone had forced you or kept you off the stand, this is that chance?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  All right, so you are telling me that you do not wish to testify?

DANA DAVID JOHNSON:  Right, I don't.

THE COURT:  Are you today, sir, under the influence of any drug, alcohol or medication that would impair your judgment?

DANA DAVID JOHNSON:  No, sir.

THE COURT:  In making this decision, do you believe that it's in your best interest?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  And, sir, is anybody forcing you or threatening you or coercing you, in any way, to not testify?

DANA DAVID JOHNSON:  No, sir.

THE COURT:  So, you are doing this freely and voluntarily?

DANA DAVID JOHNSON:  Yes, sir.

THE COURT:  Mr. Peacock, any other inquiry that you wish for me to make?

       MR. PEACOCK: No, sir—well, you and I discussed this multiple times, correct, about testifying or not?

       DANA DAVID JOHNSON: Yes, sir.

       MR. PEACOCK: And your decision today is not to testify in this case?

       DANA DAVID JOHNSON: Yes, sir.

       MR. PEACOCK: Fine, I believe that to be accurate, your Honor.

       THE COURT: Very well, then, I do find that Mr. Johnson's decision to not testify today is, again, knowingly, intelligently and voluntarily made with advice of competent counsel, in whom he has told me he is well pleased.

(Ex. B4 at 158–60).

The state court reasonably concluded that Petitioner failed to show that his decision not to testify was the product of any deficient performance by Attorney Peacock. Peacock correctly advised Petitioner that his prior criminal history could be used to impeach his credibility. As the state court noted, the mere fact that Petitioner had post-trial regrets about his decision to follow counsel's advice does not provide a basis for an IAC claim.

Petitioner has not demonstrated that the state court's adjudication of Ground Three was based upon an unreasonable determination of fact, or that was it contrary

to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled

to federal habeas relief on Ground Three.

     D.     <u>Ground Four:  "Ineffective Assistance of Counsel."</u>

Petitioner contends Attorney Peacock was ineffective for failing to file a motion

to suppress evidence of the drugs obtained by the CI as a result of the controlled buy,

on grounds of evidence tampering and lack of chain of custody (ECF No. 1 at 10; ECF

No. 21 at 22–25).  Petitioner alleges the drugs admitted as evidence at trial were not

the same drugs recovered by police from the CI after the controlled buy (*id.*).

Petitioner further alleges the drugs admitted at trial were different than the drugs

described in Lieutenant Thompson's police report as having been received from the

CI after the controlled buy (ECF No. 21 at 22–23).  Petitioner alleges the CI testified

that the drugs admitted as evidence at trial were not what he recalled having seen on

the night of the controlled buy (*id.*).  Petitioner alleges the CI also testified "that he

remembered having something totally different" at the time as compared to what was

presented in trial or stated by Lieutenant Thompson in his original report (*id.*).

Petitioner also alleges that the quantity of drugs received by the FDLE forensic lab for

testing was a different amount than the amount described by the CI and the amount

reported in Detective Thompson's report (*id.* at 23).

Respondent asserts that Petitioner's IAC claim "appears" to be exhausted, but if this court disagrees, Respondent "reserves its right to object to Petitioner's failure to do so" (ECF No. 19 at 11).   Respondent contends Petitioner has failed to demonstrate that the state court's adjudication of the IAC claim was based upon an unreasonable factual finding, or contrary to or an unreasonable application of clearly established federal law (*id.* at 35–44).

> 1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

> 2.      Federal Review of State Court Decision

Petitioner presented this claim as Ground Three of his amended Rule 3.850 motion (Ex. C1 at 13–19).   The state circuit court adjudicated the claim as follows:

> In **Ground 3**, . . . Defendant alleges that counsel was ineffective for failing to make an oral motion to suppress the evidence following disclosure of evidence of tampering and/or lack of chain of custody. However, the Defendant's allegations fail to establish either prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Further, Defendant's allegations are [too] conclusory in nature to warrant relief. *See Kennedy v. State*, 547 So. 2d 912 (Fla. l989) ("A defendant may not simply file a motion for post conviction relief containing conclusory allegations that his or her trial was ineffective and then expect to receive an evidentiary hearing.").   Further, counsel is not ineffective for failing to file motions that have no merit.   *See Magill v. State*, 457 So. 2d 1367 (Fla. 1984).   Regardless of the foregoing, the Defendant's trial counsel did make objections to the evidence during the admission of the evidence and at the close of the State's case via a Motion to Dismiss and the Court

ruled that the evidence was admissible and the State met a prima facie case as to both counts.  (*See* attached Trial Transcripts at pp. 66–79, 122–126).  Thus, the Defendant's ground is due to be denied.

(Ex. C1 at 57–58).  The First DCA affirmed the decision without written opinion (Ex. C4).

Under Florida law, a bare allegation by a defendant that a chain of custody has been broken is not sufficient to render relevant physical evidence inadmissible.  *See* Floyd v. State, 850 So. 2d 383, 399 (Fla. 2002) (citing Terry v. State, 668 So. 2d 954, 959 n.4 (Fla. 1996)).  To bar the introduction of otherwise relevant evidence due to a gap in the chain of custody, a defendant must show there was a probability that the evidence was tampered with.  *See* Floyd, 850 So. 2d at 399 (citing State v. Taplis, 684 So. 2d 214, 215 (Fla. 5th DCA 1996) (party attempting to exclude relevant physical evidence based on gap in chain of custody must show probability of tampering), *rev. granted*, 694 So. 2d 739 (Fla. 1997) (Table), *rev. dismissed*, 703 So. 2d 453, 454 (Fla. 1997)); Davis v. State, 788 So. 2d 308, 310 (Fla. 5th DCA 2001) ("A mere possibility of tampering is insufficient.") (citations omitted); Garcia v State, 873 So. 2d 426, 427 (Fla. 3d DCA 2004) (holding that the State is "not required to establish a complete chain of custody where the record does not demonstrate that there was a probability of tampering with the evidence."); Jordan v. State, 707 So. 2d 816, 818 (Fla. 5th DCA

1998) (when gap in chain of custody is alleged, party seeking to prevent introduction of relevant physical evidence must show a probability of evidence tampering because "[a] mere possibility of tampering is insufficient"), *approved*, 720 So. 2d 1077 (Fla. 1998); Bush v. State, 543 So. 2d 283, 284 (Fla. 2d DCA 1989) ("A mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence. Rather, the court should consider the probability that the evidence has been tampered with during the interim for which it is unaccounted.").

Petitioner has failed to proffer clear and convincing evidence that rebuts the state court's factual finding that defense counsel objected to admission of the drug evidence on chain-of-custody grounds.  At trial, James Scott Thompson testified that he was a lieutenant with the Chipley Police Department assigned to the narcotics investigation division (Ex. B4 at 38–39).  Lieutenant Thompson testified that after CI McKinney's controlled buy from Petitioner, Thompson collected crack cocaine and powder cocaine from McKinney (*id.* at 44).  Lieutenant Thompson identified State's Exhibit D as a "jeweler's bag," which was commonly used for the distribution of illegal drugs, such as cocaine, crackb and small amounts of marijuana (*id.* at 65). Thompson testified he sealed the bag on March 8, 2012, attached a label, wrote his name, title, and initials on it, and sealed it with evidence (or "tamper") tape, which

easily indicates if the bag is opened (*id.* at 65–66). The State offered State's Exhibit D into evidence, but Attorney Peacock requested to voir dire Thompson (*id.* at 66). Attorney Peacock questioned Thompson extensively about who had touched the jeweler's bag, where Thompson came into possession of the bag, and the contents of the jeweler's bag (*id.* at 66–69). Lieutenant Thompson testified that he received the jeweler's bag from CI McKinney at the agreed-upon meeting location after the controlled buy (*id.*). Thompson testified that CI McKinney brought the jeweler's bag to him (Thompson) (*id.*). Thompson testified that the cocaine was in the jeweler's bag when CI McKinney brought it to him (*id.*). Thompson testified he wanted to submit the jeweler's bag to the forensic lab for fingerprint analysis, and he wanted to submit the cocaine to the lab for analysis of the identity of the substance, so he removed the cocaine from the jeweler's bag and placed it in another bag (*id.*). Lieutenant Thompson testified that no one's fingerprints were identified on the jeweler's bag (*id.*). At the conclusion of voir dire, Attorney Peacock objected to the admissibility of the jeweler's bag on chain-of-custody grounds (*id.* at 69–70). The trial court overruled the objection and admitted the jeweler's bag into evidence (*id.* at 70).

Lieutenant Thompson then identified State's Exhibit E as the powder cocaine he had removed from the jeweler's bag (Ex. B4 at 71–72). Thompson testified that

he removed the powder cocaine from the jeweler's bag, placed it in another bag, sealed the bag with evidence tape, and labeled the bag with his initials, the date, and a case number (*id.*). Lieutenant Thompson identified State's Exhibit F as the crack cocaine wrapped in plastic wrap, which he had removed from the jeweler's bag (*id.*). Thompson testified that he placed the wrapped crack cocaine in another bag, sealed the bag with evidence tape, and labeled the bag with his initials, the date, and a case number (*id.*). The State offered State's Exhibits E and F into evidence, but Attorney Peacock requested to voir dire Thompson (*id.* at 72). Attorney Peacock questioned Lieutenant Thompson extensively about the cocaine, and questioned him again about the jeweler's bag (*id.* at 73–79). Thompson admitted that in his police report he described the jeweler's bag as green, but that State's Exhibit D was black (*id.* at 73–76). Thompson testified that he removed the powder cocaine (State's Exhibit E) from the jeweler's bag (State's Exhibit D) and placed it in a clear bag (*id.*). Thompson testified that he removed the wrapped crack cocaine (State's Exhibit F) from the jeweler's bag (State's Exhibit D) and placed it in a bag, which was a different size than the bag in which he placed the powder cocaine (*id.*). Thompson testified that he obtained the bags from the police department (*id.*). Attorney Peacock asked Lieutenant Thompson, "Where is the green bag?" (referenced in Thompson's police

report) (*id.* at 79). Thompson responded that State's Exhibit D was the bag which he

recovered from CI McKinney after the controlled buy (*id.*). At the conclusion of voir

dire, Attorney Peacock objected to admission of the powder cocaine and crack

cocaine, and he renewed his objection to admission of the jeweler's bag, on chain-of-

custody grounds (*id.* at 79). The trial court overruled the objections (*id.*).

Upon continuation of Lieutenant Thompson's testimony to the jury, the State

questioned Thompson about the color of the jeweler's bag, which appeared to be black

at trial. Thompson testified that the forensic lab used black powder to test items for

latent fingerprints, and the jeweler's bag (State's Exhibit D) had been submitted to the

lab for such testing (Ex. B4 at 80). Thompson testified that the powder stained items

and "tends to get everywhere" (*id.* at 81). Thompson testified that during his law

enforcement career, he sent other items to the lab for fingerprint testing, and the items

were returned from the lab discolored from the black fingerprint dust (*id.*). Thompson

then testified regarding the chain of custody of the jeweler's bag, the powder cocaine,

and the crack cocaine (*id.* at 81–84).

Attorney Peacock cross-examined Lieutenant Thompson regarding the chain

of custody of the jeweler's bag, powder cocaine, and crack cocaine, and his re-

packaging of the cocaine for submission to the forensic laboratory (Ex. B4 at 93–95).

Thompson testified that he did not weigh the cocaine prior to re-packaging it (*id.* at 95).

Jeremiah Bortle, a chemical analyst with the FDLE, identified State's Exhibits E and F as items he analyzed, based upon his initials on the evidence tape and his initials and the FDLE case number he placed on the packages (Ex. B4 at 104–10). Bortle testified that State's Exhibit E weighed 1/10 of a gram before he tested it, and testing revealed that it contained cocaine (*id.*). Bortle testified that State's Exhibit F weighed 3/10 of a gram before he tested it, and testing revealed that it contained cocaine (*id.*).

On cross-examination, Attorney Peacock questioned Mr. Bortle about the packaging in which he received the substances (Ex. B4 at 113). Bortle testified that the substances were packaged the same as they were at trial (*id.*). Bortle testified that he did not weigh either substance after he tested it (*id.* at 112). Bortle testified that when evidence is submitted to FDLE for testing, it is first tested by the chemistry department and then sent to the fingerprint department (*id.* at 115–16). Bortle testified that he never saw a green bag (*id.*). Bortle testified that FDLE records did not indicate the color of the jeweler's bag when it was sent from the chemistry department to the fingerprint department (*id.* at 113, 116). Attorney Peacock asked Bortle to "give us

a comparative of size" of the quantities of powder cocaine and crack cocaine that he

tested (*id.* at 112).  Bortle testified that 3/10 of a gram (the weight of the powder)

"would be probably about the size of your thumbnail," and 1/10 (the weight of the

crack) "would probably be a third of that or smaller" (*id.* at 112–13).

At the close of the State's case, Attorney Peacock moved to dismiss the charges,

on the ground that the repackaging and handling of State's Exhibits D, E, and F after

CI McKinney gave the items to Lieutenant Thompson, rendered the evidence

insufficient to submit the case to the jury (Ex. B4 at 122–23).  The trial court denied

Attorney Peacock's motion (*id.* at 124–26).

Attorney Peacock called CI McKinney as a defense witness, and questioned

him about the color of the bags in which McKinney received the substances from

Petitioner (Ex. B4 at 133–35, 142–43, 147, 150).  McKinney testified that the powder

cocaine was in a clear baggie, and the crack cocaine was wrapped in a torn-off piece

of a plastic bag, which he believed was yellow (*id.* at 133–34, 143, 147).  McKinney

testified that he did not believe there were any other containers which Petitioner gave

him (*id.* at 142).  McKinney testified he was not sure if he ever saw cocaine in a green

bag (*id.* at 150).  Attorney Peacock asked McKinney if any of the bag colors changed

between the time McKinney left Petitioner and the time he met the law enforcement officers, and McKinney responded, "No, sir." (*id.* at 147).

Attorney Peacock also questioned McKinney about the quantities of the powder and crack cocaine:

> Q.  I want you to educate us, what physical amount of area would it be covered, would it be the end of a rubber eraser on a pencil, would it be the size of dime, the size of a quarter or maybe the size of a silver dollar, would it cover, size-wise, any of those kind of examples?
>
> A.  The one baggie was about that big.
>
> Q.  Wait a minute, hold your fingers up, that big?
>
> A.  No, about that big around.
>
> Q.  So, you're putting your index finger and your thumb together and you're forming a circle—
>
> A.  Okay, it was a flat square baggie that had a seal on it with the powder.
>
> Q.  Okay.
>
> A.  And the other one, I guess, is about as much as that?
>
> Q.  The end of your fingernail?
>
> A.  End of your finger.
>
> Q.  The fingernail size?
>
> A.  Yes.

(Ex. B4 at 144–45). Attorney Peacock asked McKinney if any of the quantities of the substances in the bags changed between the time he left Petitioner and the time he met the officers, and McKinney responded "No, sir." (*id.* at 147).

On re-direct, the State asked McKinney if he ever saw any "dope" in a green bag (Ex. B4 at 150). McKinney responded, "I'm not sure." (*id.*).

The state court record thus demonstrates that Attorney Peacock sought to exclude evidence of the drugs on chain-of-custody grounds, but the trial court denied counsel's motions. The state court reasonably concluded that Petitioner failed to show that Attorney Peacock performed deficiently by failing to file a pre-trial motion to suppress instead of seeking to exclude the evidence at trial. The state court also reasonably concluded that Petitioner failed to show prejudice, i.e., that there is a reasonable probability the trial court would have granted a pre-trial motion to suppress on chain-of-custody grounds if Attorney Peacock had filed one. Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is

issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327). Here, Petitioner cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 18th day of July 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**